**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : : | CRIMINAL ACTION |
| vs. | : : | Docket #08-550-04 |
| PAUL NEGRONI | : : | (SAVAGE, J.) |

## DEFENDANT'S RE-SENTENCING MEMORANDUM AND
## MOTIONS FOR DOWNWARD DEPARTURE AND VARIANCE

I.    OBJECTIONS TO REVISED PRESENTENCE REPORT

II.   INTRODUCTION:  RELIEF REQUESTED

III.  MOTION FOR DOWNWARD DEPARTURE

    A.    Multiple Victim Enhancement Overstates
       Defendant's Offense and His Culpability

    B.    Post-Offense Post-Sentencing Rehabilitation:

IV.   MOTION FOR DOWNWARD VARIANCE

V.    CONCLUSION

## DEFENDANT'S SENTENCING EXHIBITS

1.    Report, Dr. Lara Fastman, December 28, 2011

2.    Letter, Paul Negroni

3.    Letters of Support, Family & Friends

STEPHEN ROBERT LaCHEEN
DAVID E. SHAPIRO
Attorneys for PAUL NEGRONI

1429 Walnut Street, Suite 1301
Philadelphia, PA 19102
(215) 735-5900
(fax) (215) 561-1860

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : : | CRIMINAL ACTION |
| vs. | : : | Docket #08-550-04 |
| PAUL NEGRONI | : : | (SAVAGE, J.) |

**DEFENDANT'S RE-SENTENCING MEMORANDUM AND**
**MOTIONS FOR DOWNWARD DEPARTURE AND VARIANCE**

TO THE HONORABLE TIMOTHY J. SAVAGE, JUDGE OF THE SAID COURT:

Defendant Paul Negroni, by his counsel, respectfully submits the following memorandum and motions in mitigation of the sentence to be imposed upon him in the above matter.

## I.    OBJECTIONS TO PRESENTENCE REPORT

Defendant incorporates herein by reference his Objections to the Revised Presentence Report dated November 21, 2011.

## II.    INTRODUCTION: RELIEF REQUESTED

Paul Negroni is a first-time, non-violent, non-drug offender. Based upon the totality of his circumstances, he petitions the Court to mitigate the punishment for his offense and impose a non-custodial sentence no more punitive than the five year probationary sentence, including nine months' in-home detention, initially imposed upon him on November 23, 2009.

In determining the sentence to be imposed within the guideline range, or whether a departure or variance from the guidelines is warranted, the Court may consider, without limitation, any information concerning the background, character, or conduct of defendant, unless otherwise prohibited by law. 18 U.S.C. §3661. USSG §1B1.4; *Pepper v. United States*, 131 S. Ct. 1229, (2011); *Tapia v. US*, 131 S. Ct. 2382, (2011); and *United States v. Salinas-Cortez*, 660 F.3d 695 (3d Cir. 2011).[1]

*United States v. Koon*, 518 U.S. 81, 116 S.Ct. 2035 (1996), clarified a sentencing court's authority to grant a downward departure for any reason not prohibited by the Guidelines, or if a mitigating factor has not been adequately considered by the Sentencing Commission. *Koon* continues to provide guidance now that the sentencing guidelines have been determined by the Supreme Court to be advisory and not mandatory. *United States v. Booker*, 543 U.S. 220; 125 S. Ct. 738 (2005).

The law permits a Sentencing Court to disregard a specific Guideline where it is "reasonable" for the Court to do so. *Pepper, supra,* at XX; Booker, supra, at 261-262, 125 S. Ct. 738; *Gall v. United States, 552 U.S. 38, 51-52; 128 S. Ct. 586; (2007); Kimbrough v. United States, 552 U.S. 85; 109; 128 S. Ct. 558 (2007).* In this instance, that legal precept applies to USSG §§ 2B1.1(b)(2)© and 5K2.19.

---

[1]     Mr. Negroni's sentence on November 23, 2009, was subsequently vacated by the Court of Appeals and remanded for resentencing. Since then there have been significant Amendments to the Sentencing Guidelines, and rulings by the Supreme Court of the United States and the Third Circuit, which directly impact defendant's resentencing, particularly regarding applicability of potential downward departures or variances based upon offender characteristics and post-sentencing rehabilitation.

Defense counsel respectfully submits that there are significant factors in this case which, considered in combination, support the mitigated sentence prayed for; that is, a probationary sentence, with credit for the nine months already spent in home detention, and the months already served on probation.

## III. MOTION FOR DOWNWARD DEPARTURE:

### A. Mitigating Offense Factors: Multiple Victim Enhancement Overstates Defendant's Offense and His Culpability

The factors most strongly mitigating Paul Negroni's offense are reflected in the robotic application of the Sentencing Guidelines victim enhancement (USSG §2B1.1(b)(2)©). That enhancement almost doubles Negroni's Guideline calculation when his actual conduct occurred post completion of victimization by Waltzer and others.

In this regard, at Negroni's Sentencing, this Court stated:

> "I consider...the nature and circumstances of the offense. And in this particular case we have a massive criminal fraud scheme that resulted in a loss of over $40 million that was orchestrated by Kevin Waltzer. Mr. Negroni's role, albeit not minor, was limited to only a portion of the scheme and loss. He was lured into this scam by his long-time friend, Waltzer, whom he knew from childhood and trusted as a brother..." [N/T 11/23/09(pm),50; 638 F.3d 434, 441.]

In the standard terminology of the Sentencing Guidelines, the robotic calculation of Paul Negroni's offense level overstates the level of his comparative culpability. A downward departure from the six-level enhancement for multiple victims would reduce his Total Offense Level to 21, with applicable guidelines of 37-46 months, which would accurately reflect the factors which most strongly mitigate Paul Negroni's offense.

4

The Court initially denied Defendant's objection to the six-level upward enhancement.  Counsel now moves the Court for a downward departure pursuant to USSG §2B1.1 Application Note 19©, on the ground that the six-level upward enhancement results in a substantial overstatement of the level of Negroni's culpability, for the following reasons:

(a)  The government's admissions reflected in PSR ¶51 establish that Negroni had no involvement in making or presenting the false claim in the Bank of America class action in 2002, or in obtaining the settlement check in July 2004.   His involvement was limited to forming a corporation in September 2004 to receive and disburse the funds as directed by Waltzer.

(b)  The government's admissions reflected in PSR ¶51 establish that Negroni's role with regard to that fraud was more akin to that of a money-laundering accessory after the fact than an aider and abettor of the offense which was completed before he ever became involved.

©    Negroni's limited role in the overall conspiracy does not warrant holding him responsible for Waltzer's role in making and the Bank of America claim or obtaining the proceeds thereof.

(d)  An upward enhancement for multiple victims is inappropriate for the further reason that Negroni's specific acts do not present the usual harm that  enhancement was intended to address; that is, the kind of criminal activity by which an offender serially victimizes multiple individuals by discrete offenses;   e.g.,   telemarketing   schemes,   boiler-room operations,   Ponzi   schemes,   etc.,   involving   calculated attempts to victimize multiple victims.

(e)  According to co-defendant Porto's attorney Mark Wilson, the Court ruled the six-level enhancement inapplicable to Porto's false Bank of America claim, based upon sufficiency grounds (oral   representation   of   lawyer   representing   the   victim administrator of the settlement funds insufficient proof) and lack of evidence that Porto had any foreseeability as to the number of victims.

5

If the Court denies Negroni's motion for downward departure, counsel moves the Court to grant a downward variance pursuant to 18 U.S.C. §3553(a)(1), on the ground that, based upon the specific facts of this case, the six-level upward enhancement is unfair and draconian, and calls for an overall advisory prison sentence that is far greater than necessary to satisfy the parsimony principle of §3553, and to avoid an inappropriate disparity of sentence.

## B. Mitigating Offender Factors: Post-Offense, Post-Sentencing Rehabilitation

Based upon the December 28, 2011 Evaluation and Report of Negroni's therapist Lara Fastman, LCSW, CASAC, counsel moves the Court for a downward departure pursuant to the principles expressed by the Supreme Court in *Koon* and *Pepper*, *supra*, and the opinion of the Third Circuit in *Salinas-Cortez*, *supra*, on the ground that, since his sentencing over 2 years ago, Mr. Negroni has been in therapeutic treatment with Fastman. Fastman reports that:

> Negroni has demonstrated a solid commitment to his ongoing psychotherapy in order to identify and recognize long-held maladaptive patterns of belief, thinking and behavior so that they never recur and he will not repeat these actions. Negroni has demonstrated to others that he has changed remarkably since the start of therapy. Clinically, it is obvious that between sessions Paul thinks about, considers, and mulls over what we discussed. As a clinician I can authoritatively state that kind of effort is rare.

*USSG* §5K2.19, Post-Sentencing Rehabilitative Efforts (Policy Statement), provides that post-sentencing rehabilitative efforts are not an appropriate basis for a downward departure when re-sentencing a defendant for that offense.

6

In *Pepper*, however, the Supreme Court rejected the Sentencing Commission's rationale for §5K2.19, concluding that "the Commission's views rest on wholly unconvincing policy rationales not reflected in the sentencing statutes Congress enacted," and in rejecting that rationale, the Court stated:

> "...evidence of postsentencing rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing...Postsentencing rehabilitation may also critically inform a sentencing judge's overarching duty under § 3553(a) to "impose a sentence sufficient, but not greater than necessary" to comply with the sentencing purposes set forth in § 3553(a)(2).
>
> "Our post-*Booker* decisions make clear that a district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views. That is particularly true where, as here, the Commission's views [regarding post sentencing rehabilitation] rest on wholly unconvincing policy rationales not reflected in the sentencing statutes Congress enacted;" *Pepper*, at 1247."

Mr. Justice Breyer, a former Commissioner for the Sentencing Commission, states in his concurring opinion,

> "The Commission offers no convincing justification for creating this exception with respect to postsentencing rehabilitation. ...The second question is whether, given the sentencing court's power to disregard the policy statement forbidding departures based on postsentencing rehabilitation, the facts and circumstances here could warrant a departure (or variance) for that reason. And the answer, in my view, is yes. This case presents unusual rehabilitative circumstances." [2] *Id,* at 1254-55.

---

[2]    It is beyond argument that, based upon the Supreme Court's rationale, the Commission did not adequately consider post-offense rehabilitation as a sentencing factor. Therefore, pursuant to *Koon* that factor can be considered for treatment not only as a downward variance, but under the right circumstances as a basis for a Step 2 downward departure from the advisory Sentencing Guideline range.

In *Salinas-Cortez,* Chief Judge McKee stated, to the same effect:

"In *United States v. Pepper,* the Supreme Court held that, once the original sentence is set aside on appeal, a district court could consider postsentencing rehabilitation in determining an appropriate sentence on remand, unless the court ordering the remand.

"The reason for such consideration is readily apparent. Appropriate sentences can only be imposed when sentencing courts 'consider the widest possible breadth of information about a defendant.' It is only then that we can 'ensure that the punishment will suit not merely the offense but the individual defendant.' As we have previously explained, the now advisory Guideline range is but one of many factors that must be considered if a court is to properly impose a sentence that is tailored to the offender rather than one that focuses only on the offense....

"<u>It is only by ensuring that the individual circumstances of the defendant are not obliterated by the offense that an individual's potential to successfully rejoin society is maximized and the interest of public safety advanced</u>....

It should therefore not be surprising that a defendant's postsentencing rehabilitation may illuminate a defendant's character and assist the sentencing court in assessing who the defendant is as well as who s/he may become. Such information may, in some cases, be as significant in ascertaining the defendant's character and likelihood of recidivism as the defendant's conduct before s/he was forced to account for his/her antisocial behavior. [Emphasis added] [Internal citations omitted].

If the Court denies Negroni's motion for downward departure, counsel move the Court to grant a downward variance based upon the specific facts of this case; pursuant to 18 U.S.C. §3553(a)(1), for the reasons explained in *Pepper v. United States,* 131 S. Ct. 1229 (March 2011); *Tapia v. US,* 131 S. Ct. 2382; 180 L. Ed. 2d 357 (June 2011); and *United States v. Salinas Cortez,* 660 F.3d 695 (3d Cir. 2011).

## IV. MOTION FOR DOWNWARD VARIANCE:

Defendant seeks a Downward Variance(s) from the applicable sentencing guidelines based in part on the recent Guidelines Amendments alluded to in Footnote 1, pertaining to offender characteristics, and detailed below.— The Court must fashion its sentence to meet the specifications of 18 U.S.C. §3553(a)(2), which requires the sentencing judge to impose a sentence "sufficient but not greater than necessary" to:

(a) Reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense;

(b) Afford adequate deterrence of criminal conduct;

(c) Protect the public from further crimes of the defendant; and

(d) Provide the defendant with needed educational or vocational training, medical care, or other corrective treatment in the most effective manner.

In addition to the mitigating factors detailed in Sections II and III, above, Defendant respectfully submits that the mitigated sentence he seeks would achieve those goals, considering the significant contributing factors evident in Defendant's childhood psychological trauma, lack of parental guidance, dependant personality disorder, and their relationship to his offense conduct.

At the sentencing in 2009 herein, the Court stated:

> "I look at the history and characteristics of the defendant. ..He had a disruptive and unstable childhood punctuated by violence. He has a dependent personality disorder, which makes him a follower rather than a leader. ..He certainly does not have a substantially reduced mental capacity as a result of his psychological

9

disorder; nevertheless, it is there. ...."[3] *Id.*

Defendant's motion for downward departure based upon diminished capacity was previously denied by the Court.   The mitigating factors advanced as supporting same - severe psychological childhood trauma, lack of parental guidance, and dependent personality disorder in connection with Waltzer - do provide a solid basis for downward variance based upon:

(1)   USSG §5C1.1 Application Note 6, effective November 2010 (where defendant's criminality is related to a significant mental illness, the sentence can include a downward departure/variance for treatment);

(2)   §5H1.3 (Mental and Emotional Conditions), effective November 2010, permitting for the first time District Court Judges to consider under limited circumstances personal offender characteristics, such as mental illness in which a defendant has a significantly impaired ability to control behavior that the defendant knows is wrongful; and

(4)   18 USC §3553(e).

To support this Court's sentencing conclusions, Negroni submitted numerous letters from family and friends and reports from Dr. Thomas Kucharski, a forensic psychologist who evaluated Negroni, and Lara Fastman, a therapist who had treated him. Both view Paul in mitigating terms, Dr. Kucharski reported that:

> My clinical impression of Mr. Paul Negroni, based upon my interview, the psychological testing, review of the Criminal Indictment and letters from his wife and brother, is that he as a result of substantial abuse and neglect suffers from and has suffered from since childhood serious psychological deficits and liabilities. These deficits explained in detail below led Mr. Negroni

---

[3]   Additionally, at Negroni's sentencing this Court stated "He [Negroni] was lured into this scam by his long-time friend, Waltzer, whom he knew from childhood and trusted as a brother."

to form an intense dependent attachment to Mr. Waltzer. This attachment and dependence created in Mr. Negroni an unquestioning, naïve trust in Mr. Waltzer, a strong need to please, low self esteem and a denigrating self appraisal. This attachment in turn strongly influenced Mr. Negroni's involvement with Mr. Waltzer in the instant offenses

...His attachment to Mr. Waltzer began in childhood during a period when he was particularly vulnerable after the divorce of his parents and during the abusive family situation.   In response to the abuse and neglect Mr. Negroni bonded to Mr. Waltzer who he looked up to as an older brother figure and someone who represented a safe relationship.   The bonding leads to a long pattern of reliance on [Mr. Waltzer], a need to be accepted and a naïve pattern of compliance so as not to disrupt the relationship.

...In summary the results of psychological testing reveal..., self esteem and identity problems, significant psychological distress, poor ability to discern the intentions of others, poor judgment, rigid control over his emotions and anger and resentment, most of which is likely the consequence of a long history of abuse and neglect.

Mr. Negroni, because of this attachment, his rather naive perception of Mr. Waltzer and his lack of autonomy, had great difficulty viewing him as someone who could potentially put him in harms way. ...

Fastman's report made similar findings:

"My diagnostic impressions of Paul Negroni are based upon Dependent Personality Disorder...a pervasive and excessive need to be taken care of that leads to a submissive and clinging behavior as well as fears of separation...Paul's pathological attachment to Kevin also prevented him from questioning Kevin's business plan."

## 1.  Paul Negroni's Childhood

To fully appreciate how someone like Paul Negroni came to commit
the offense he did, it is necessary to examine that offense in the
context of Paul Negroni's whole life, including, especially, the
nature of his relationship with Kevin Waltzer.

> "There are only two lasting requests we can hope to give
> our children.  One of these is roots; the other, wings."
> -Hodding Carter

Paul Negroni received neither of those gifts.  As a child, he was
uprooted from the parental nest - living during the week with a
mother unable to protect herself let alone him from his step-
father's brutality.  To her credit, she eventually acknowledged the
horror and sent her three children to live with their father.

Unfortunately, Paul's father was already living with a woman with
children of her own, and had no room for his three.  So he set his
three young children up in a nearby apartment where he could at
least insure that they had room and board, and be able to see them
on weekends.  What they did not have, however, was continuing daily
guidance and the security of his presence.

> "Your children need your presence more than your
> presents."                              -Jesse Jackson

Paulie, as he was called, became the charge of his older brother,
himself still a teenager, who was involved in his own quest to
establish his own identity, and was hardly equipped to become a
surrogate parent. But there was someone who stepped into the
breach.

12

"When one has not had a good father, one must create one."                                -Friedich Nietsche

Paulie's friends became more than just the center of his social life.  They became his surrogate family - a group of teenage boys. One in particular, a year or so older, became more than just a good friend, more than just a best friend, more than just an older brother.  He became Paulie's protector, his mentor, his role model and, worst of all for Paulie, he became Paulie's primary source for ego gratification, the person from whom Paulie sought approval, the person whose companionship Paulie constantly needed and sought. That was Kevin Waltzer.

Thus, were the seeds of Paulie's crime sown decades earlier.

It would be redundant to summarize in a paragraph or two here, what is so completely and universally made clear by Paul Negroni's family and friends in their letters of support - that Paul Negroni suffered from a life-long unhealthy relationship with Kevin Waltzer, described by some as a form of hero-worship, and by the professionals as a form of dependency.  Suffice it to say that Paul Negroni spent a lifetime "needing" the approval and companionship of his mentor, guide, and "big-brother," Kevin Waltzer; just like an  alcoholic must have his drink; a drug addict requires his fix; or a  gambler needs to make a wager.  The common thread is that all knew what they were doing was wrong but they chose not control their behavior.

As to Paul Negroni's progress in understanding how he came to be involved in this criminal offense, and why, the following comments are noteworthy:

13

The Court previously found that Paul Negroni suffered from some level of psychological fragility, but not enough to justify a downward departure based on diminished mental capacity. Counsel anticipates the Court would confirm its prior ruling in that regard, but also again consider that mitigating factor as partial justification for the variance previously granted.

Counsel assumes the same with regard to Paul Negroni's lack of guidance as a youth; that is, although not sufficient in itself to justify a downward departure, it is a factor supporting the grant of a variance from the applicable guideline.

The Court did not previously consider whether the combination of both factors would support a downward departure; and counsel respectfully suggests that those two factors in combination would indeed support a downward departure in the guidelines, such that even a relatively small variance would justify the re-imposition of a non-custodial sentence.

(B)  18 U.S.C. §3553(a)(2)(D) requires that in fashioning an appropriate sentence the Court consider the need for any sentence to "provide the defendant with needed educational or vocational training, <u>medical care</u>, or other correctional treatment in the most effective manner."

In pertinent part 18 USSG §3582(a) states:

>  The court, in determining whether to impose a term of imprisonment, ...shall consider the factors set forth in [18 USSG §3553(a)]..., <u>recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation</u>....

14

In this connection *Tapia v. US*, 131 S. Ct. 2382; 180 L. Ed. 2d 357; 2011 U.S. LEXIS 4556, June 16, 2011, and *U.S. v. Olhovsky*, 562 F.3d 530 (3rd Cir. 2009) require a District Court in fashioning an appropriate sentence consider and weigh whether incarceration will interfere with rehabilitation.

Treatment and therapy at the time a defendant is "ripe for it" can benefit not only that defendant but also make society safer in the long run than incarceration, by breaking the cycle of psychiatric problems that propitiate criminality/recidivism. The inescapable conclusions to be drawn from the recent updated evaluation of Dr. Fastman (Exhibit 1)and the recent letters from Negroni's family members (Exhibits 2 - 6) are that: (1) This is the first time in Paul's life that he has had intensive and extensive therapy; (2) Negroni has a strong desire to change his life; (3) the letters from his family establish that Negroni has very strong family support; (4) treatment and rehabilitation are working, but, there remains a long road ahead; (5) There is a high probability Negroni will not be a recidivist; and (6) Continued rehabilitation may be jeopardized if Negroni is incarcerated in a prison-type facility. Rehabilitation can only be attributed to a combination of the treatment and therapy (which have continued through the present), and Negroni's commitment to turn his life around.

In this regard the Government will be hard pressed to disagree with the proposition that, when presented with the right factual scenario, District Court Judges have the authority to vary downward in order to promote a defendant's rehabilitation.
The Solicitor General's Brief in *Tapia* states:

> "Congress did not intend to prohibit courts from imposing
> *less* imprisonment in order to promote a defendant's
> rehabilitation....On the contrary, as discussed above,

15

Congress specifically envisioned that courts might choose
probation in lieu of imprisonment in order to promote the
defendant's rehabilitation or might impose a short term
of imprisonment followed by a term of supervised release
for that purpose...Furthermore, as the Third and D.C.
Circuits have pointed out, Congress had no need to use
any different or additional language, because Section
3582(a) already contains an "express instruction that
sentencing courts must recognize the inappropriateness of
imprisonment for rehabilitation both in choosing [a term
of] imprisonment rather than a non-incarceration sentence
and in determining the length of the term.""

Brief for United States, p.40.

The essence of *Tapia* is that "imprisonment is not an appropriate
means of promoting correction and rehabilitation," and "Each actor
at each stage in the sentencing process receives the same message:
Do not think about prison as a way to rehabilitate an offender."
Negroni seeks a downward variance to facilitate his rehabilitation.

(C)   In January 2009, the Sentencing Commission issued a monograph
      entitled *Alternative Sentencing in the Federal Criminal
      Justice System*, which in pertinent part states:

> "Increasingly, criminal justice professionals have
> argued that dwindling prison space should be
> reserved for the most serious and dangerous
> offenders, necessitating a reconsideration of
> alternative sanctions for first-time and nonviolent
> offenders...
>
> In response to both the increasing monetary and
> social costs of incarceration, a growing number of
> states have begun implementing money-saving, public
> safety-oriented solutions. These solutions include
> diverting low-risk offenders from prison,
> implementing alternative sanctions, and shortening
> prison terms....

16

Highly restrictive supervised release is adequate in white collar cases for general deterrence, and such alternatives reserve jail space and funding for more dangerous offenders who are likely to be recidivists.

> Three decades of growth in America's prison population has quietly nudged the nation across a sobering threshold: for the first time, more than one in every 100 adults is now confined in an American jail or prison. ...the number of people behind bars in the United States continued to climb in 2007, saddling cash-strapped states with soaring costs they can ill afford and failing to have a clear impact either on recidivism or overall crime. *The Pew Center on the States, One in 100: Behind Bars in America 2008.*

## V.  CONCLUSION

In *Gall v. United States*, 128 S.Ct. 586, 598 (2007), the Supreme Court quoted its earlier opinion in *Koon v. United States*, 518 U.S. 871, 113 (1996), and reminded all involved in the criminal justice system that the diverse frailties of humankind do not readily lend themselves to a cookie-cutter, one-size-fits all, approach to sentencing:

> "It has been uniform and consistent in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

Defendant respectfully suggests that, pursuant to 18 U.S.C. §3553(a), a probationary sentence is appropriate. Such a sentence would be fully consistent with the "parsimony" principle of sentencing, that a Court should impose a sentence that is "sufficient, but not greater than necessary," to accomplish the goals of sentencing.

17

The parsimony principle has been described by the United State Supreme Court as the "overarching instruction" of 18 U.S.C. §3553(a). *Kimbrough v. United States*, 128 S.Ct. 558, 563 (2007); see also, *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) noting that the §3553(b) factors are more than a laundry list of matters to be considered but compromise "a tapestry of factors, through which runs an overarching principle," the court's duty "to construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." (emphasis added).

The Mitigating factors in Paul Negroni's traumatic childhood - the abusive treatment at the hands of a sadistic step-father, his inability to protect his mother and sister from such abuse, the abandonment of parental responsibility, and his understandable hero-worship for Kevin Waltzer - were the subject of extensive submission prior to his sentence on November 23, 2009.

The Court here was right the first time around. Paul Negroni is an individual who did not (and does not) need to be incarcerated to satisfy Society's interest in obtaining a just and fair sentence for his offense. First and foremost for consideration in that regard is how he has handled himself in the 18-months since sentence was imposed.

The proof of the pudding is in the eating, as the cliché has it; and Paul Negroni has proved himself if not only fully appreciative of the opportunity extended to him by the Court, but fully capable of conducting himself in the manner the Court expected as a decent, law-abiding citizen, who has done everything in his power to atone for his prior misdeeds and create anew life which hews strictly to Society's precepts for a "good life."

18

For the reasons set forth above, counsel for Paul Negroni will respectfully request at his sentencing hearing that the Court impose a non-custodial sentence.

Respectfully submitted,

STEPHEN ROBERT LaCHEEN
DAVID E. SHAPIRO

Attorney for PAUL NEGRONI

19

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| United States of America | : | Criminal Action |
| | : | |
| v. | : | Docket #2:08-cr-00550-04 |
| | : | |
| Paul Negroni | : | (Savage, J.) |

## DEFENDANT'S SENTENCING EXHIBITS

### Table of Contents

1.   Evaluation & Report,
     Lara Fastman, LCSW, CASAC, 12/28/2011

2.   Paul Negroni, Letter

3.   Paige Negroni, Letter (Wife)

4.   William and Arlene Heller, Letter (In-Laws)

5.   Peter Negroni, Letter (Father)

6.   Susan Levine, Letter (Mother)

7.   Amy Negroni, Letter (Sister)

8.   Daniel Negroni, Letter (Brother)

Respectfully Submitted,

DAVID E. SHAPIRO
STEPHEN ROBERT LACHEEN
1429 Walnut St., Suite 1301
Philadelphia, PA 19102
Counsel for Paul Negroni
Telephone: 215-816-3935
Fax: 215-689-4588
e-mail: dshap66@comcast.net

Date: December 29, 2011

Lara Fastman, LCSW, CASAC
351 Manville Road, Suite 101
Pleasantville, NY 10570
(914) 572-1723
License # 070863

December 28, 2011

Mr. David E. Shapiro, Esq.
1429 Walnut Street, Suite 1301
Philadelphia, PA  19102

**RE: Case of Paul Negroni**

Dear Mr. Shapiro,

You have asked me to describe for the Court Mr. Paul Negroni's work/rehabilitation in psychotherapy over the last almost three (3) years; specifically to explain the changes I have seen in him and what he has learned as the result of his sentencing, punishment, and therapy to date. You have also asked if I have an opinion as to whether he is taking rehabilitation seriously, and what effect incarceration would have on his ongoing therapy/rehabilitation.[1]

---

[1]    You have advised me that, based upon the evaluation of Paul by Dr. L. Thomas Kucharski dated May 6, 2009, including accompanying letters from some of Paul's family members, and my evaluation of November 2009 Judge Savage stated:

> "...He [Paul] had a disruptive and unstable childhood punctuated by violence. He has a dependent personality disorder, which makes him a follower rather than a leader. .. [Paul was lured into this scam by his long-time friend, Waltzer, whom he knew from childhood and trusted as a brother.] He certainly does not have a substantially reduced mental capacity as a result of his psychological disorder; nevertheless, it is there. ... He seems to be a dreamer, a fantasizer of what he can be when he grows up. ..Until I heard him today I was not so sure that he had accepted his responsibility. But I'm convinced that he has and is truly remorseful not only because he has gotten himself in this jam, because he recognizes that it was wrong."

1

**Exhibit 1 -  Fastman Eval 12/28/11**          **Pg. - 1**

**Executive Summary:**

Mr. Negroni has demonstrated a solid commitment to his ongoing psychotherapy in order to identify and recognize long-held maladaptive patterns of belief, thinking and behavior so that they never recur and he will not repeat these actions. Prior to Mr. Negroni's sentencing he also demonstrated and expressed to me his complete acceptance of responsibility for his criminal conduct and its consequences. Minimization and projection of blame onto others stopped years ago. The attached recent letters from family and friends corroborate what Mr. Negroni has related to me, and that he has demonstrated to others that he has changed remarkably since the start of therapy.

Our work together began on April 7, 2009. Mr. Negroni's attendance, participation, and therapeutic efforts are impressive, and unusual. Paul not only consistently attends all scheduled sessions without being late or cancelling an appointment, he comes prepared to work on getting better. Clinically, it is obvious that between sessions Paul thinks about, considers, and mulls over what we discussed. As a clinician I can authoritatively state that kind of effort is rare.

Mr. Negroni's house arrest proved to be a blessing. According to Paul, he established a positive relationship with his Probation Officer with whom he continues to work in a productive way. Apparently, the probation officer imposed rather strict standards which he expected Paul to comply with. The rigidness of house arrest rules and their enforcement contributed significantly to Paul's becoming scheduled and consistent in all his affairs. Paul related that he would wake at the crack of dawn to attend his nearby gym, work a full day, to return home to be with his two children long before his curfew. Recently, Paul informed me that the Probation Officer advised him that instead of their having to meet in person for the remainder of Paul's Five year sentence they can instead correspond through mail. From my discussions with Paul it is clear to me that he has taken the role of "probationer" with the utmost seriousness.

I believe that Mr. Negroni has also taken the consequence of paying restitution on a monthly basis with the utmost seriousness. Repaying the government is Mr. Negroni's priority. He works daily in the office and from home in the field of banking recruitment. Even in today's struggling economy he has been working hard to earn a decent income which has permitted him to voluntarily increase his monthly restitution payments.

In my opinion, to a reasonable degree of psychological certainty, Paul is well on the road to fully understanding the root causes of his insecurities, and mistakes

**Exhibit 1 -  Fastman Eval 12/28/11          Pg. - 2**

stemming from a history of trauma and strong dependency on others, particularly his unhealthy relationship with Kevin Waltzer.[2]  Mr. Negroni is steadily becoming an incredibly strong and emotionally stable man who for the first time in his life is developing maturity and independence in his thinking and functioning.  However, in my opinion there is still a long way for Paul to go.  I strongly believe incarceration would bring a halt to his rehabilitation at a critical time in his life. More than ever he is committed to self-improvement in all areas of functioning.

**Narrative of Therapy to Date:**

I will first state my diagnostic formulation and render my opinion about the impact that interrupting his therapy would have on Mr. Negron's history of being vulnerable to being unduly influenced and risk of re-engaging in future criminal behavior.

1. Posttraumatic Stress Disorder (DSM-IV: 309.81)
2. Adjustment Disorder with Mixed Emotional Features (DSM-IV: 309.28) chronic type
3. Dependent Personality Disorder (DSM-IV: 301.6)

Upon entering therapy Mr. Negroni provided overviews of his birth, childhood and adulthood. Paul was born the second child of his parents, Peter and Susan (ages 25 and 21 respectively at the time of Paul's birth). Paul has one older brother and two younger sisters. His father was one of four children born to Hispanic immigrants and was raised poor in Spanish Harlem. His father went on to achieve a PhD and a successful administrative career in education.

Pauls' mother was also raised in Harlem and born to Russian immigrants. As a child she lived in poverty like his father. Her father died when she was age 10. After conceiving 4 kids in 5 years her marriage ended due to her husband having several affairs and working compulsively.

---

[2]  In connection with my diagnosis of dependent personality disorder by analogy, as explained below, during the relevant time period I see Paul as being "addicted" to Kevin and unable to "separate" from him the same way an alcoholic, or drug abuser cannot stop drinking, or overcoming his drug of choice.  In combination with Paul's admission that he wanted the money, this addiction explains why Paul chose not stop himself even though he knew that falsification of the documents was a crime.  Paul's psychopathological issues are very similar to those faced by drug and alcohol abusers, or gamblers who on some level know that what they're doing is wrong and harmful, but, nonetheless either choose not to control, or cannot control  their behavior. Together we are addressing the addictive nature of the relationship between Paul and Waltzer.

3

**Exhibit 1 -  Fastman Eval 12/28/11**          **Pg. - 3**

Paul's traumatic childhood continued with his mother's second husband, a physically and emotionally abusive alcoholic from Uruguay, who was an uneducated mason. Although he ultimately died from liver cancer, he subjected Paul, his siblings and mother to violence and alcoholism. Paul witnessed his mother being continually physically abused. Paul and his siblings were also victims of horrific physical and emotional abuse. Paul's sisters were sexually abused. Paul wanted to protect and save his mother and sisters from this malicious man. As a child he was helpless and unable to protect his mother and siblings from ongoing severe abuse. When Paul was 14, his father took custody of all his children. Even though Paul's father attempted to rescue Paul he compulsively worked and Paul was often left to his own devices.

Because of Paul's loneliness he was easily attracted to Waltzer whom he met at age 10, two years after his parents' divorce. Kevin offered Paul a much needed reprieve from his home being shattered by divorce and his mother's remarriage to a physically and emotionally abusive alcoholic. Kevin became more than a friend through the years. Paul describes him being more like a brother and family member. I believe Waltzer became like a drug for Paul in that he soothed Paul and although made promises he could not keep Paul remained faithful to him.

In our initial sessions Paul presented as significantly depressed and anxious stemming from his recent arrest and criminal charges. He denied suicidality but early on in his treatment I was greatly concerned he may cause harm to himself as a result of his legal troubles and the damage he had done to his relationship with his wife and family as a result. Paul was traumatized by the having been "deceived for years by Kevin Waltzer his long time friend." I was struck by the unreasonable degree Paul was dependent on Kevin. Paul trusted Mr. Waltzer unconditionally, without questioning his motives. He truly believed his friend would never do something to harm him and his family. Paul's total inability to question Waltzer's motives and intentions or objectively judge his character precipitated Paul's criminal behavior. An individual learns to form healthy attachments beginning in infancy and through adolescence. Paul was not provided this learning experience due to his dysfunctional upbringing. Treatment focuses on this "learned" trait. This is another reason why treatment should not be interrupted. It is imperative Paul continue to develop healthy attachment skills and healthy relationship patterns.

Paul suffers with abandonment depression, which describes a person who was not well taken care of during the most defining moments in one's life: infancy and childhood. Because of Paul's chaotic upbringing he was left feeling abandoned

and alone. As a result, Paul developed a sense of helplessness. According to "learned-helplessness theory," depression can improve if the person develops a sense of control and mastery of the environment. Paul has made great strides in this area of treatment.

At first, our priority was to stabilize Paul's mental health and begin working on his dependency issues. Beginning in childhood he suffered with low self esteem and spent most of his time with friends to help escape from his abusive and chaotic home. His early childhood and adolescence can best be described as characterized as a quest to form a secondary family.

Over time, Paul grew dependent on Kevin, looking up to him and envying his happy family. Kevin offered Paul something every child needs: stability and safety. When trauma occurs in childhood, emotional development is frequently arrested. Survivors of trauma usually cannot use internal emotional states as signals, and often experience an inability to sooth themselves when under stress. Also, a victim of trauma receives secondary gains from the external world, the common gains being monetary compensation, increased attention or sympathy, and the satisfaction of dependency needs. Those "gains" serve to reinforce the trauma disorder and its persistence. This theory proves to be true in Pauls' case. As an antidote to significant trauma, Kevin offered Paul a sense of hope and security. Early on in the relationship Paul felt he could 'depend' on Kevin. He trusted Kevin implicitly and looked to him for help in his career. Through college and early adulthood he continued to struggle with depending on Kevin, feeling like they were closer than brothers. Trauma and abuse led Paul to look for feeling "protected" and a sense of belonging outside of himself rather than developing that internally.

During the course of treatment, the more Paul revealed the more it was clear to me that he has little sense of himself as an independent autonomous functioning person. Throughout his life he gravitated towards people whom he felt he could trust and be close to but with little reason to do so. Mr. Waltzer provided him with a false sense of "being taken care of" when in fact he was just perpetuating Paul's fears of being abandoned, abused and alone. Paul grew attached, "addicted to" Mr. Waltzer beginning at a vulnerable period in his development, at one time residing with him and his family in Florida. Plain and simple, in Paul's world, approval from Mr. Waltzer was what Paul wanted. That is not Waltzer's doing, it was Paul's. Waltzer simply saw he could manipulate Paul's vulnerability to serve his own purposes (and, from time to time, even Paul's).

**Exhibit 1 -  Fastman Eval 12/28/11          Pg. - 5**

Treatment has helped Paul to evaluate situations and information for himself, to act accordingly and appropriately, and not strive simply to please anyone in authority. He is coming to understand that he has the right and duty to think for himself, and to trust his own judgment and thinking. He has come to understand that he enjoys helping people and doing what he can to make a difference in another person's life. Paul has learned the difference between helping others and just pleasing them.

Throughout treatment Mr. Negroni has been forthcoming and responsive to my interventions. I have gently helped him to face his traumas and realize he no longer needs to feel like a victim. He has worked to become more empowered and self-sufficient in all areas of functioning. Early on in treatment I worked with him to become active in the community and help others in need, which he did through volunteering in several organizations. The purpose of this intervention was to help Mr. Negroni see himself as 'helpful' rather than as 'helpless'. During treatment we also address the effectiveness of becoming more spiritual, through literature, prayer and meditation. My interventions were based on learning Paul's natural abilities. He is a soft-spoken and kind individual who is gaining great satisfaction in improving his life and contributing to the lives of others.

Today, Paul understands he was "addicted" to Kevin and unable to "separate" from him the same way an alcoholic can not stop drinking, refusing to see alcohol as a lethal poison. Paul was addicted to Kevin in many ways. With any addiction it is hard to separate yourself from the substance, in Paul's case another person. Paul is addressing the addictive nature the relationship Kevin had on.

I have requested several of Paul's family members to provide information regarding changes they have seen in Paul's conduct since his original sentencing date. (Copies of their letters are attached.) In my opinion, those letters corroborate Paul's transformation since his original sentencing in November 2009. It is clear to me that his family is experiencing the benefits of Paul's therapeutic process. Without doubt he has matured, and is healing from being the victim of childhood abuse leading to dependency on others beginning in adolescence and through his adult years.

Paul Negroni's lust for money outweighed the dangerous consequences of his behavior. This is common dynamic for an "addict," explained by the desire for gratification at any cost. Paul's pathology greatly contributed to his criminal behavior and rehabilitation has helped him accept this truth and translates to the likelihood he would never engage in criminal activity again.

**Exhibit 1 -  Fastman Eval 12/28/11**     **Pg. - 6**

The recovery from an addiction begins with surrendering one's denial and accepting that addiction is a real disease that can be treated. Paul has achieved this first step in treatment by identifying his risk taking behaviors. Today, Paul acknowledges he knew what he did was wrong and the pathology behind his criminal behavior. Paul's dependent personality led him unable to say "no" to Kevin. He wanted to be liked and approved by Kevin at all costs.

Throughout the relationship with Kevin Waltzer Paul exhibited signs of "euphoric recall" which is another dynamic addicted individuals suffer with. They remember and exaggerate the good times they had when using a substance while blocking out the bad times. Paul held on to the childhood and adolescent experiences he had with Kevin, such as when he stayed with his family and provided him frequent relief from his chaotic and abusive upbringing. Paul committed criminal acts when Kevin asked him to because Paul's positive life experiences with Kevin outweighed the dangerous and illegal behaviors he committed.

Paul is achieving the developmental sequence of recovery, which is as follows: (1) refrain from use of the dangerous substance, which in Paul's case is quick fixes to earn money or engage in dependent relationships; (2) replace addiction centered living with sobriety-centered living; (3) interrupt addictive and compulsive behaviors; (4) replace addictive thinking with rational sober thinking; (5) learn to identify and manage feelings and emotions; and (6) change the self-defeating core beliefs about ourselves, others and the world we learned as children.

This model of recovery used in Paul's treatment has proven to be beneficial to his rehabilitation. This model generally takes 5-7 years to successfully complete and is best uninterrupted, especially since it is effective in treating Paul's pathology.

In conclusion, I believe with a reasonable degree of medical/psychological certainly, that Paul Negroni is fully engaged and committed to the therapeutic process. Moreover, again with a reliable degree of medical/psychological certainty, if treatment continues as it is at present, his need to form pathologically dependent relationships with untrustworthy and manipulative others will completely diminish.

It is my opinion that it would be very harmful to Mr. Negron's rehabilitation were he to be incarcerated and away from those who motivate his efforts at rehabilitation, enabling him to continue to contribute to society in a positive way, to continue his weekly ongoing therapy and to use his discovered skills and talents. None of these will come from imprisonment.

7

**Exhibit 1 -  Fastman Eval 12/28/11**          **Pg. - 7**

More than anything else, incarceration would strip Paul of the positive support structure he has been able to develop over the past three years. He has come a long way, but his therapy is still very much a work in progress, and interruption at this stage would work a difficult and potentially devastating setback, one that could jeopardize the gains he has made to date.

Very truly yours,

*hara fastman, lcsw, CASAC*

Lara Fastman, LCSW-R, CASAC
Licensed Clinical Social Worker, New York
NPI# 1063598803

Paul Negroni

21 Indian Hill Rd.

Mt. Kisco, NY 10549

December 23, 2011

Timothy J. Savage, USDCJ

7614 U.S. Courthouse

601 Market Street

Philadelphia, PA 19106-1797

Dear Judge Savage,

The day you sentenced me, you gave me a true opportunity, I have tried to use it to change the direction of my life. I never violated the trust you placed in me. I understand that I committed a serious crime and that your decision was an opportunity to prove that I could pay my debt to society, and be working on rehabilitation without going to jail.

I have been in therapy with Dr. Lara Fastman for the last 3 years. With her help we constructed a life plan that would enable me to deal with why I was willing to commit a crime to get the money, the role I permitted Kevin to play in my life and in the crime, and to help me keep my family together. It is obvious to me that intensive therapy is required for me to fully understand myself and reconstruct my life. Dr. Fastman has helped me to begin to realize the reasons why I did what I did, and how to change. She has helped me understand why I was chasing pipe dreams and never really faced reality. I realize I still have a long way to go. This is the first time in my life that I finally feel alive, living a focused and structured life being able to provide for my family and not borrowing money to survive. Therapy has helped me build confidence and give me a direction in life.

1

**Exhibit 2 - Paul Negroni Letter**          **Pg. - 1**

One of my most important goals is to repair my marriage and family. I'm from a divorced family and therefore keeping my family together is something that is extremely important to me.

There is not a day that goes by where I am not humiliated and embarrassed for what I did to myself, Paige my wife, and our children. This will never go away. It has been extremely difficult because as you can imagine Paige is rightfully very angry with me. We love each other and we have managed to stay together working hard at making our life successful for us and the children.

My plan of action after many therapy sessions with Lara is to take this entire experience and turn it into a positive one. As to the mental pain and suffering every day of my life as Lara would say live today and get through the day and when tomorrow comes you will deal with it. This has helped me be successful at work and help me reconstruct my relationship with Paige and our family to the point where it looks like we can survive my bad judgment. Believe me Paige reminds me every day about the anguish, embarrassment, and humiliation I have brought upon myself and our family. Paige is tougher and stricter than any prison guard.

Don't let anyone kid you; House Arrest and supervision are punishment. The things I was deprived of helped awaken me. One example is that I can't be a coach for my kid's sports team because I'm a convicted criminal for me that was devastating. This experience will be with me for the rest of my life. This has been the most important learning experience in my lifetime. Now after 40 plus years I'm finally living.

Initially, my PO, Senior Probation Officer, Mark Maffucci in White Plains NY went over all the requirements. We discussed my ankle bracelet and the importance of this punishment. It started out and continued to be a very structured environment where I would wake up, go to work and come home. Mr. Maffucci would show up to my house and work unexpectedly. I understood the importance of following the requirements of my sentencing and I did not deviate from one single requirement. I followed the guidelines of my sentencing to the letter of the law. USPO Maffucci helped me more than anyone could have imagined. He was clear and stern, and has clear expectations for my behavior. I recognized that this man was an honest man and interested in me as a person and my rehabilitation. I am committed to never letting him down. He has also been a great teacher. Being accounted for every second of the day took the joy out of my life, made me think about what I did wrong, and has helped me face the consequences for my criminal

2

**Exhibit 2 – Paul Negroni Letter**     **Pg. - 2**

conduct, and has given me great structure and discipline.. The combination of therapy, and punishment have enabled me to function as an Adult for the first time.

I have become a disciplined and serious person with clear goals as a result of my work with my therapist, my family and my Probation Officer who I quote "it's because of you that you have been accomplishing the goals you set and no one else. You have decided to take this path, you should be proud of yourself".

I want to stress that committing this crime is something that I truly regret. It has impacted the way I think about every single thing in my life. I think about everything I do and assure myself that I will never break the law again. I fully scrutinize every action I take, even to the extent that I do not drive above the speed limit. This crime and punishment has changed my life. I'm independent making my own decisions.

I focus every day of my life on paying back every cent I stole; that is a priority. I have for the first time in my life a Job where I work hard every day and am finally being successful financially. This has enabled me to continue to repay the money I stole. I have become a better person and am working hard at being a contributor to society. I know what I did was wrong and I deserved punishment for it.

I commit to continue in this direction and take full advantage of the opportunity you gave me. I will never forget what I did. I think about it every day of my life.

Thank you for what you have done for me.

Very truly yours,

Paul Negroni

3

**Exhibit 2 - Paul Negroni Letter         Pg. - 3**

Paige Negroni
21 Indian Hill Rd. Mount Kisco, NY 10549

December 23, 2011

Honorable Timothy Savage
United States District Court
9614 United States Court House
601 Market St. Room
Philadelphia, PA 19106

Dear Judge Savage,

I write to you 2 plus years later since my husband Paul Negroni was sentenced in your court with a slightly less heavy heart then before. With a great deal of hard work Paul has transformed himself into a better husband, father, and person since you gave him the opportunity to seek the help he needed while still being punished for the crime he committed. I never realized how truly badly Paul needed help until he was convicted of this crime. His horrible upbringing made him the type of person that tried to coast through life instead of taking charge of his own destiny. But that has changed.

Paul now wakes up daily and has a routine. Instead of waiting for an easy way to make money Paul has a job that he has not missed one day of since his sentencing. He goes to the gym at 5 am every morning, work, and then home. He wants to work and better himself. He is not trying to find an easy angle to make it in life. He also takes things very seriously now and is more mature. He knows everything was almost taken away from him and wants to make things right.

His house arrest was very humbling. We had a lot of time to discuss how Paul wants to pay back the money he received illegally. We discussed how Paul did not understand what it was like to have a family that was supportive of him instead of abusive. But it has not been easy. The stress of our huge debt and the constant reminder of what has occurred makes therapy necessary for Paul.

I promised you I would not let Paul forget what he has done and I have not let you down. Our relationship will be forever changed-I don't look at him the same and remind him all the time of what he has done to our family.

Please let Paul continue to stay with our family and continue to work hard, pay back the money he owes and be a good example for our children. Jail will only hinder his progress and ruin the lives of 2 wonderful children.

Sincerely,

Paige Heller-Negroni

*Paige Hel-Negroni*

1

**Exhibit 3 - Paige Negroni Letter (Wife)        Pg. - 1**

William and Arlene Heller
175 East 62nd Street 6C
New York, NY 10065
212-758-1043
646-327-3742
E Mail Hellerassociates@nyc.rr.com

December 5, 2011

Dear Ms Fastman:

We are writing this letter on behalf of our son-in-law Paul
Negroni. Since his sentencing in November 2009, we have
witnessed a huge transformation in Paul. As you know, he is in
therapy once a week and in our opinion it has changed his life.
He now possesses a committed work ethic, and has become
responsible for providing for his family and paying back the money
he owes. He is very focused on work and establishing a successful
career. We see a high level of maturity, security, responsibility and
independence that was not present two years ago. He is now able
to analyze situations in an insightful manor and is more emotionally
independent and less impulsive. He has always been a
compassionate and loving husband and father, and now knows he
has the skills and ability to become successful on his own.

Sincerely,

Arlene Heller

William Heller

# Exhibit 4 - William & Arlene Heller (In Laws)   Pg. - 1

Peter Negroni
1271 Baldwin Road
Yorktown Heights, NY 10549

December 23, 2011

Honorable Timothy Savage
United States District Court
United States Court House
601 Market St. Room 9614
Philadelphia, PA 19106

Dear Judge Timothy Savage,

I am writing this letter on behalf of my son Paul Negroni who is coming before you on January 9, 2012 for resentencing. I want to bring you up to date with my sons changed behavior since sentencing over 2 years ago. Paul has taken the opportunity you gave him and changed his life completely.

Paul has found a real job and given up the idea that he can get rich without hard work and full commitment to a job. He is fully dedicated to his work and the therapy he is receiving with Dr. Fastman. From what I have seen Paul is beginning to feel self-worth and value because he is actually being successful at something while supporting his family at the same time. He has been successful in a position in personnel recruiting, even though this industry is suffering greatly during these tough economic times. This is due to his firm determination to become successful.

Paul is determined to work hard, keep his family together and pay back all the money he obtained illegally. I'm committed to helping him pay back the money as well once we finish with legal fees. I can see he feels self satisfaction when he sends a check to the courts to pay back the money he stole.

Therapy has changed the way Paul lives his life by teaching him, to be responsible for his actions. Therapy has helped him to structure his life so he has a daily routine where every day he reflects on his crime and how he hurt himself, his family and society. There is not a day that Paul does not think about his crime and is truly remorseful for what he did. He feels full responsibility for his crime and does not blame anyone other than himself for what has happened. I know this because I speak to him every day.

When I left the courthouse on his sentencing day, I felt the hardest thing for him would be maintaining his family intact. Paige, Paul's wife was angry and bitter that he had done what he did. I can now report to you that Paul has not only kept his family together but is beginning to regain Paige's trust and that of her family because of his changed behavior. Because of the reaction of his wife and her family this process has not been easy. However, he continues to work diligently at improving his

**Exhibit 5 - Peter Negroni Letter (Father)     Pg. - 1**

relationship with them. I know he loves Paige and the children dearly and that he has a firm goal to keep the family intact.

I ask you to please consider these factors when you resentence Paul on January 9, 2012.

I thank you for reading this letter,

Very truly yours,

Peter Negroni

**Exhibit 5 - Peter Negroni Letter (Father)**      **Pg. - 2**

September 7, 2011

Honorable Timothy J. Savage
United States District Court
United States Courthouse
601 Market Street, Room 9614
Philadelphia, PA 19106

Honorable Judge Savage,

I would like to take this opportunity to share with you the positive changes my son, Paul
Negroni, has made in his life since he appeared before you in November of 2009.

I have been aware of how Paul's childhood has affected him and what a dysfunctional
home Paul grew up in. The mental and physical abuse his stepfather imposed on Paul
was terrible. Paul's low self esteem and his longing for normalcy led him to seek
comfort and acceptance. Unfortunately this had severe consequences and came to a
terrible ending. Since this terrible crime, Paul has made some serious changes for the
better. He has become closer to his family and calls me several times weekly. Paul has
made the decision to take a different and positive path.

Paul is working hard, paying back as much money as he possibly can. He mentions often
during our conversations that the most important thing is to work hard and pay back all
the money that he owes. Paul spends much of his free time with his two children and
sees his therapist, Lara, weekly without fail. He is currently committed to receiving the
help he needs. I see quite a change in Paul. Your sentence has helped him turn his life
around for the better. Paul's children are great kids. In my previous letter to you I
mentioned that Jacob (one of the twins) has some health issues. At the present time, he is
under the care of a neurologist. Paul and his wife, Paige, are very involved in his care.
This, too, has become a challenge and a learning experience. Your sentencing has
enabled Paul to seek psychological intervention and to become financially independent,
taking full responsibility in meeting his financial obligations.

At the present time, my son is working hard on his personal and psychological issues. I
am proud of the effort he makes daily. Changes have been positive and he has truly
learned a lesson. I feel that Paul will continue on this path and will make a positive
contribution to society.

Thank you for taking the time to read my letter.
Respectfully,

Susan M. Levine
2880 Meadow Park Avenue
Henderson, NV 89052
702-526-5648
lasvegasbubbie@cox.net

**Exhibit 6 - Susan Levine Letter (Mother)     Pg. - 1**

Amy Negroni-Annett

222 Kneeland Ave

Yonkers, NY 10705

December 8, 2011

Honorable Timothy Savage
United States District Court
9614 United States Court House
601 Market St. Room
Philadelphia, PA 19106

Dear Judge Savage:

I am Paul Negroni's sister. I am writing on behalf of my brother who I consider to be the rock in my life. I am married and have 2 children and teach in the New York City school system.

Over the past few years Paul has been going to therapy to work on himself I have been with him every step of the way as he would do the same for me. The amount of growth he has made has been immense. Therapy has taught him so many things, but the one thing I have noticed is that he has learned to be himself. He has learned to lean on people when needed, but has also learned that he himself can be a leader and not a follower. He has changed his life, for the better, in so many ways. He is a hard worker and a great father.

I am hoping you consider all of the wonderful things he has been able to accomplish to move forward with his life. He is a person who has contributed to society in a positive way and will continue to do so. He is a great teacher and role model to his children. The amount of love he has for his children goes beyond words. I ask that you do not change the direction of Paul's life as he has made full strides to redeem himself.

Sincerely,

Amy Negroni-Annett

Sister

**Exhibit 7 -  Amy Negroni Letter (Sister)     Pg. - 1**

Daniel Negroni, Esq.
5041 Seachase Way
San Diego, CA 92130

May 24, 2011

Honorable Timothy Savage
United States District Court
United States Courthouse
601 Market Street, Room 9614
Philadelphia, PA 19106

Re: Reference Paul Negroni

Dear Mr. Savage:

The purpose of this letter is to provide a reference for Paul Negroni for the court.  I will address a number of areas of Paul's experiences and my perception of the status thereof since his sentencing.

Since serving his sentence Paul has been a model citizen.  He was most diligent during serving his sentence including the requirements of probation and continuing to work towards resolution of a healthy, productive, legally compliant and contributory life.

After his arrest it is my understanding that Paul has been in therapy to understand himself as well as the motivations and lapses in judgment that prompted his actions. He has been working diligently to explore the causes and heal the past.  He has also come to terms with a legal and moral definition of right and wrong.  Personally, I believe he will not make the same mistakes.

Additionally, he has spent a great deal of time repairing both his family relationships and reputation through hard work.  He has also been resolving what it means to truly be independent have a family of his own as well as focus on continuing to learn and grow and give back to the community through his family.  My perspective is he succeeding with flying colors.  In addition to at home repair he has been diligent in resurrecting his career with 100% commitment to succeeding in his current employment.

Please let me know if you have any questions or need further information.

Sincerely yours,

Dan Negroni

**Exhibit 8 - Daniel Negroni Letter (Brother)     Pg. - 1**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : : | CRIMINAL ACTION |
| vs. | : : | Docket #08-550-04 |
| PAUL NEGRONI | : : | (SAVAGE, J.) |

### CERTIFICATE OF SERVICE

I hereby certify that copies of Defendant's Sentencing Memorandum and Motion for Downward Departure and Downward Variance, and Defendant's Sentencing Exhibits have been served upon the following by first class mail on this date:

Karen R. Myslinski, USPO
Federal Office Building, Suite 2400
600 Arch Street
Philadelphia, PA 19106-1679

AUSA Louis Lappen
AUSA Derek Cohen
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

STEPHEN ROBERT LaCHEEN
Attorney for PAUL NEGRONI

DATED: December 28, 2011